UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ESTATE OF JORDEN VIDANA, JORDAN
VIDANA, JR., JADEN VIDANA, and
JAYLEN VIDANA,

        Plaintiffs,

    vs.                      Case No. 23-CV-82-JDP

LUIS REYES GOMEZ, HP TRANS CORP,    Madison, Wisconsin
and DRIVE NEW JERSEY INSURANCE     May 23rd, 2024
and SENTRY SELECT INSURANCE COMPANY.  9:10 a.m. - 9:50 a.m.

        Defendants.
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ESTATE OF LEONARD ROBERT
HOPINKA, HELES-WV-CEXI-WI HOPINKA
WHITECLOUD and NO-KO-SELVS-TE
HOPINKA WHITECLOUD
And ESTATE OF TYLER EDWARD      Case No. 23-CV-486-JDP
DECORAH and KENDRICK DECORAH

                      Madison, Wisconsin
        Plaintiffs,         May 23rd, 2024
                      9:10 a.m. - 9:50 a.m.

    vs.

LUIS REYES GOMEZ, HP TRANS CORP,
and DRIVE NEW JERSEY INSURANCE
and SENTRY SELECT INSURANCE COMPANY.

        Defendants.
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

STENOGRAPHIC TRANSCRIPT OF SETTLEMENT APPROVAL HEARING
HELD BEFORE CHIEF U.S. DISTRICT JUDGE JAMES D. PETERSON

APPEARANCES
For the Plaintiff:
        Lein Law Offices
        BY: MATTHEW CURTISS LEIN
        15692 US Hwy. 63
        P.O. Box 761
        Hayward, WI 54843

          PHILIP C. HARRELSON, RMR, CRR
       U.S. District Court Federal Reporter
        120 North Henry Street, Room 410
          Madison, Wisconsin  53703
             1-608-261-5708
               \*\*\*

```
 1   APPEARANCES CONTINUED:

 2   Also Present:

 3           ROBERT BARNES, Personal Representative
             TIM EIDEN, Personal Representative
 4           KYLE TORVINEN, Personal Representative
             BIANCA WHITECLOUD HOPINKA, Personal Representative
 5           JACLYN CARRIAGA, Personal Representative

 6                                  ***

 7           (Proceedings called to order at 9:10 AM.)

 8           THE COURT:  Let's start with the appearances.  So go ahead,

 9   Mr. Lein.  Why don't you -- maybe it would be useful -- you could

10   just introduce everyone, how about that?

11           MR. LEIN:  Certainly, Your Honor.

12           Attorney Matt Lein appearing for the plaintiffs.  Tim

13   Eiden -- Attorney Tim Eiden appearing for the Hopinka children.

14   Attorney Robert Barnes appearing for the Decorah children.

15   Attorney Kyle Torvinen appearing for the Vidana children.

16           We also have Bianca Whitecloud Hopinka appearing for the

17   Hopinka children, who is their mother, and then we have Jaclyn

18   Carriaga appearing on behalf of the Vidana children, Your Honor.

19           THE COURT:  All right.  Good morning.

20           Is there anyone from the defendants here?

21           MR. LEIN:  No.

22           THE COURT:  Don't hear anyone.  Okay.  They don't -- they

23   don't need to be here, but there is one aspect of this that I

24   want you to be very clear how we're -- how we're handling it.  So

25   they need to be informed of it.
```

1    So I have looked over everything.  I'm pleased that you were

2    able to manage this to a settlement.  I -- I have no concerns

3    with the settlement.  I'm -- I'm persuaded that the settlement

4    is -- is -- it's a good day's work for you, Mr. Lein.  So

5    congratulations on that.  I have no concerns about the overall

6    settlement amount.

7    I am also persuaded -- I was a little surprised, because I

8    thought we had started with a presumption that we would divide

9    everything three ways.  I think that there is a very reasonable

10   basis to adjust the distribution to be 37 and a half percent for

11   the Vidana and Hopinka heirs, and then 25 percent for the Decorah

12   heirs.  That -- that makes -- I think that's well-explained.  So

13   I have no -- no problem with that.

14   The issues that I have really are kind of at the tail end

15   that.  We'll talk a little bit about how we're actually going to

16   manage the money for the -- for the benefit of the heirs.

17   There's a few details.  I just want to be clear about that.

18   And then the issues that I have here are the calculation of

19   the attorneys fees.  I have reviewed all the expenses.  I have

20   one concern with one aspect of the expenses.

21   And so those are my -- my -- my three issues that we have.

22   So let's -- let's just start with the sort of overall calculation

23   of the attorney's fees.  And I know you addressed this in your

24   memo, but I -- I'm just not persuaded that taking the attorney

25   fees off the top is the appropriate way to go.

1    The Seventh Circuit precedent is really clear that -- a

2    couple of things:  One, as you say, there's no hard-and-fast

3    rules about approving the attorney fees.  So it isn't really just

4    a matter of applying some strict formula.  There's judgment

5    involved.  I have to make an assessment about what's -- what's

6    reasonable and what's fair.  And so there's a lot of different

7    ways to do it.

8    But Seventh Circuit precedent is pretty clear that in

9    evaluating a contingency-fee arrangement, the appropriate way to

10   do it is to compare what the attorney gets to what the clients

11   get, and the expenses then are set to the side for that analysis.

12   And so what that means is that in looking at your -- your

13   contingency fee of -- of one-third, what I do is I would take the

14   expenses off the top and then look and see whether having a third

15   of the net amount is appropriate.  And so I think that's the

16   appropriate starting point here.

17   That's not all there is to it.  And so I always -- in any

18   attorney-fee case, regardless of the basis for the recovery, even

19   when it's an attorney fee -- or contingency-fee recovery, I

20   always ask for a lodestar crosscheck to find out how much effort

21   went into it.

22   And there's a couple of things that I'm concerned about

23   there.  One is I want to prevent there from being a windfall --

24   an unjust windfall to the attorney because sometimes with a

25   contingency-fee case, you get a big settlement with such little

1    effort that it's just not -- would not be fair to enforce the

2    contingency fee against the client.  And so I check against that,

3    but I also am looking out for the attorney because I want to make

4    sure that this wasn't one of those cases in which it was an

5    extraordinary amount of work just to get a small settlement, and

6    it's in one of those cases where it's appropriate to allow

7    recovery in a case like that.  There are some cases where they

8    just don't pay out very much, but it's important that they be

9    litigated.  So the attorney has to be compensated.

10       This isn't one of those cases that's either -- an outlier

11    either way.  This is a case in which the lodestar results in a --

12    the effort was about $60,000, just sort of accepting the

13    presentation and the hourly rate.  I don't find any of the -- any

14    of the time or the -- or the hourly rate for Mr. Lein really to

15    be out of line.  So it's about $60,000 worth of effort.

16       And if I do as I suggest and just look at the recovery of

17    the clients against Mr. Lein's recovery, a third of it --

18    speaking in round numbers now -- a third of that net recovery

19    would be $150,000.  So that would represent two and a half times

20    the amount of his lodestar effort.

21       And I think that is a completely normal and acceptable

22    multiplier because -- obviously, it's a contingency-fee case.  So

23    there's a risk of non-recovery.  So it's appropriate that in a

24    contingency-fee case where the attorney bears the risk of

25    non-recovery -- that he recover more than what the lodestar

1    amount is, and I think two and a half times lodestar multiplier

2    is an appropriate risk bonus here.  So I have no trouble with

3    that.

4        If we take it -- the fees off the top, that multiplier goes

5    up quite considerably, and it -- it results in a significant

6    decrease in the recovery to the clients.  So I'm going to require

7    that in calculating the payouts here -- that the attorney fees be

8    calculated on the net basis and the expenses be taken -- the

9    expenses go off the top, and then the attorney fees are the net

10   amount.

11       There's a policy reason for this too, and that is that if

12   the contingency fee is calculated on the gross amount, the

13   attorney has no incentive to control the costs of the litigation.

14   And so there is just a good sound reason for me to evaluate the

15   attorney's fees and look at it at the net amount, and that's the

16   just result here.

17       So I'm -- I'm going to approve the one-third contingency fee

18   but calculate it on the net amount of the recovery to the -- to

19   the clients.

20       So speaking in round numbers, then, we end up with $150,000

21   of expenses.  A hundred and -- then that leaves a net recovery of

22   $450,000.  150 of that -- one-third -- will go to Mr. Lein and

23   $300,000 will then go to the clients.

24       Speaking of the expenses then -- get to my second concern --

25   the expenses are not ones that I will really fundamentally

1    second-guess.  Mr. Lein made judgments about what he had to do,

2    and I really don't see much to complain about with one exception,

3    and that is the -- the expert work of Mr. Locketz -- or

4    Dr. Locketz -- the medical expert.

5         And I do have a question for Mr. Lein before I give you my,

6    kind of, analysis, but one of the opinions that Dr. Locketz

7    rendered was about the pre-death distress of Mr. Vidana, and I

8    wondered why that issue was only examined for Mr. Vidana and not

9    for the other two decedents.  And so, Mr. Lein, why was that only

10   an issue for Mr. Vidana and not Mr. Decorah and Mr. Hopinka?

11        MR. LEIN:  Your Honor, we started the case, and I got the

12   materials.  I sent it over to Mr. Locketz -- or attorney --

13   excuse me -- Dr. Locketz.  He gave me the opinion.  Thereafter,

14   we took the depositions of some of the -- some of the police

15   personnel that were investigating the scene.

16        And let me put a note.  Your order required me to send you a

17   list of all the depositions.  Unfortunately, there was a lot

18   going on, and I just didn't file it.  So if the Court wants, I

19   can give you that list in an updated declaration.  You can see

20   who we deposed and why.  Most of it's liability and the other was

21   for the structure of the company.  But nonetheless --

22        THE COURT:  Isn't that already in your brief?

23        MR. LEIN:  You know, I looked through the exhibits again

24   this morning, and I didn't see it.  I'll double-check.  If it's

25   not, I will file it because you requested it.

1          THE COURT:  Okay.  Very good.  Thank you.

2          Your brief said you did 11 depositions.  I think that's

3     reasonable.

4          MR. LEIN:  Mm-hmm.

5          THE COURT:  And so I'll -- I'll accept your presentation on

6     that, but go ahead and file it.

7          MR. LEIN:  Understood.

8          THE COURT:  So on to the question about the pre-death

9     distress of Mr. Vidana, but not the other two decedents.

10          MR. LEIN:  Sure.  So we got the report for Vidana as to

11     pre -- pre -- the pre-accident distress, but then we took the

12     deposition of the sheriff, or police personnel, that investigated

13     the scene.  And based off the testimony there, I reconsidered the

14     position, and I just -- to be frank -- I didn't think that that

15     was a -- that wasn't something that I could sell to the jury as

16     to the distress.  So to save money, I didn't do it for Hopinka

17     and I didn't do it for Decorah.  That's -- that's the

18     justification.

19          THE COURT:  I understand that, and that -- because my

20     concern was that it's -- two concerns here with the Locketz work.

21     First of all, I understand the position that in the Rule 26(a)(1)

22     initial disclosures, the defendants raised the issue of causation

23     as one of the issues that would be contested.  Now, in that early

24     presentation -- and, again, I didn't get those documents.  So I

25     didn't see quite how they articulated it.  But my surmise is that

1    early on in the -- in the case, they took the position that

2    basically all of the issue -- all of the potential issues that

3    you would have to prove in your claim would be contested,

4    including causation, but that seems to me to be an issue that

5    could have been resolved by stipulation.  You had the autopsy

6    reports.  You have the police reports.  And so to me, there was

7    no reasonable dispute about causation.

8         And so when I look at an expert report that costs $1,500 for

9    each one of the -- of the decedents to say that they died in the

10   car accident, I thought I'm just not really sure that that's a

11   reasonable -- reasonably incurred expense when you had the

12   underlying documents that really said that they died in the

13   accident.  And then -- so I question whether, you know, a

14   reasonable person would be paying $1,500 for that report.  I also

15   question whether the report itself really was worth $1,500 for

16   each of those three reports, saying -- saying exactly the same

17   thing.  So I question that.

18        When I look at the report on the pre- -- on the pre-death

19   and distress of Mr. Vidana, that too I question.  As you -- you

20   made a very reasonable assessment, I think, about the litigation

21   position, but the opinion itself, it seems to me, is so

22   conclusory that I wouldn't have admitted that opinion had the

23   issue been litigated, because the opinion is too conclusory to

24   pass the rules of evidence pertaining to expert opinion.  So that

25   wouldn't have gone in.

1    So here's what I'm going to do:  I'm going to cut the

2    expense of the -- of the Locketz work -- I'm going to cut that in

3    half.  And so I can't say it was totally unreasonable to even

4    consider doing it, but I think the expense of the Locketz work

5    was -- was much greater than its actual value.  So I'm going

6    to -- that's the one thing that I thought was worth addressing.

7    So I'm going to -- I'm going to cut the expense in half for

8    the Locketz work down the line.  And then I'm also going to --

9    given the theory behind it -- although, the work was done

10   originally for Mr. Vidana's case -- the theory applies to

11   everyone.  So to be fair to everybody, the half of the Locketz

12   opinion work will be distributed across all three of the -- of

13   the decedents, and they'll each bear a share, but only of the

14   half of the cost of the Locketz expert work.

15   I did have a concern about the Davis and Pledl bill for the

16   expert work because, as we went through there, I thought there

17   was a conflict situation to have them do that -- both do that

18   work.  And so a representation that's not consistent with the

19   rules of professional responsibility is really not something that

20   can be billed for, but it's such a small amount that I'm not

21   going to require any adjustment there.  I'm just going to

22   consider that to be a reasonably incurred expense that was based

23   on an initial view of the case.  So I'll just leave the $600

24   there.

25   The other expert -- or the GAL work -- I really don't have a

1    problem with; although, Mr. Eiden's work has to be documented

2    with a bill.  And so I assume that we're in the ballpark there of

3    what Mr. Lein has asked, but I'll ask Mr. Eiden to submit his --

4    his bill with his time records so that I can approve that.

5          So, Mr. Eiden, can we -- has your bill been submitted by

6    now?

7          MR. EIDEN:  It has not, because I didn't know what followup

8    work would be necessary after today, Your Honor.

9          THE COURT:  Okay.  I don't see much for you.  So I'll give

10   you a -- I'll give you a week to get your bill in so that we can

11   wrap this up.  So that's fine.  So I don't have any objection

12   on -- on the guardian ad litem work.  And so that will be fine.

13         As I said, the only expense that I see as problematic was

14   the Locketz work.  So we'll take care of that.

15         Let's talk about the probate expenses.  The bottom line is I

16   don't have a problem with it.  I have a little bit of concern

17   with how it's presented in the -- in the -- in the statements,

18   but let me say this: I think these probates were -- were

19   necessary -- particularly with Mr. Decorah, because that's how we

20   get a binding agreement from the Decorah estate -- is to have the

21   personal representative.  So I don't have any problem with that.

22         But I want to make clear that I am not in a position to

23   approve the expenses of the probate -- particularly, Mr. Lein's

24   attorney fees -- or the fees of the personal representative.

25   That's a matter that's within the jurisdiction of the probate

1    court.  The probate judge is -- is responsible for approving the

2    fees in the probate, and he's in a position to do it, where I'm

3    not.  So I don't really -- I'm not in a position to oversee that.

4        So I want to be very clear that I'm not approving the fees

5    of the -- of the -- of the probate.  That will be a matter for

6    the probate judge.  But I don't think that has to concern us

7    here, because, in the probate, if he disapproves any portion of

8    the fees, that will just go to the -- to -- back to the estate,

9    and the -- and the heirs will take whatever the judge

10   disapproves.

11       And so I just want to be crystal clear that I'm not

12   approving the probate.  You still have to go to the probate court

13   to have to probate judge approve the fees of the personal

14   representatives and Mr. Lein's fees, and I'm just not in a

15   position to do that.  I'm not saying I see anything really

16   unreasonable.  I will say that the probates were necessary.  I

17   get that.  How he did them; how much it cost -- that's going to

18   be a matter for the probate court.

19       The one thing that concerns me about the transparency of the

20   disclosure is that in the settlement statement for each -- each

21   decedent, there's an amount of expense to the -- to the clients.

22   So the Vidana estate -- it was $40,000.

23       Well, that number is really just sort of an arbitrary number

24   that Mr. Lein puts into the estate for purposes of doing the

25   calculation and getting the bills of the estate paid, but it's --

1    in a sense, it sort of represents the client's own money.  So I

2    would like the settlement statement to be very clear about what

3    the -- what the clients are actually taking from the settlement

4    of this case.

5        And so then the -- the probate then is really a different

6    matter because I -- I assume that what Mr. Lein will do is --

7    actually, the entire settlement, then, will actually be part of

8    the estate, and then it will run through the probate, and the --

9    and the children will all take -- take that.

10       So the $40,000 that's assigned as a -- sort of a probate

11   expense is sort of a placeholder number that's kind of an

12   arbitrary number.  There's nothing wrong or inappropriate about

13   it, but it just -- if you look at the settlement statement, then,

14   there's no number that just tells the Vidana family how much they

15   have realized from the -- from the litigation.

16       So one of the things that the Seventh Circuit appreciates is

17   that you have a nice transparent disclosure of what the

18   attorney's fees are and what the benefits of the settlement are.

19   So what I would like to do is have the expenses off the top.

20   Then the net amount has Mr. Lein's fees; and then the net

21   proceeds of the settlement are clearly stated on the settlement;

22   and then the probate expenses follow that, and that's really just

23   a matter of the probate and the -- and the families are

24   responsible for bearing the costs of the probate, subject to the

25   approval of the -- of the probate court.

1    So there's no objection to anything that has happened.  It's

2    just I would like the presentation -- the settlement statement to

3    be a little bit clearer so that the families know exactly what

4    they realize from this litigation -- separate and apart from the

5    probate, which is sort of -- just sort of a necessary expense of

6    wrapping up the estates.

7        All right.  This is a technical detail that I didn't put on

8    the agenda earlier, but all the filings here have so far been

9    done *ex parte*.  And so let me ask, Mr. Lein, what the logic for

10   that is because, honestly, I don't really see any need to have

11   the -- the presentation even under seal.  I don't see anything

12   that's really confidential here.

13       There's -- as I said, there's no confidential information

14   about the minors or anything.  So, obviously, we always redact

15   personally identifying information from -- from court filings.

16   So none of that sees the light of day, but I don't see any reason

17   to file these even under seal.

18       So, Mr. Lein, tell me what the logic is there?

19       MR. LEIN:  Well, in particularly, Your Honor, the reports of

20   the guardian ad litems here -- they're disclosing the cons of our

21   case.  Every case has cons.

22       THE COURT:  Oh, yeah.

23       MR. LEIN:  The folks on the other side -- opposing

24   counsel -- they're obviously very smart, very aggressive people,

25   and I was concerned that if I filed the GAL reports not under

1  seal or *ex parte* -- like we had done previously --

2       THE COURT:  Right.

3       MR. LEIN:  -- and the -- and the Court didn't approve the

4  minor settlement, the other side was going to waive those reports

5  and those concerns in my face.

6       THE COURT:  All right.  So I understand that.  Which kind of

7  raises another sort of technical question here because I -- I

8  don't exactly know the status of your settlement.  Is the -- do

9  we have a signed settlement agreement?  What -- what -- what do

10  we have?  Because once the settlement agreement is signed off on,

11  then, it seems to me, there's no basis for keeping this

12  confidential.

13       MR. LEIN:  There is a mediation statement settlement

14  agreement that was -- that was signed, and it says "conditioned

15  on approval of --"

16       THE COURT:  Okay.

17       MR. LEIN:  "-- the minor settlement."

18       THE COURT:  All right.

19       MR. LEIN:  I can certainly provide that to you if you'd

20  like, Your Honor.

21       THE COURT:  I would like to see that, yeah.  So I just want

22  to make sure the paperwork is really done appropriate here.

23       Okay.  So that is a perfectly valid reason to keep these *ex*

24  *parte* at this point.  But once I approve the -- once I approve

25  the settlement, then I'm going to -- I'm going to unseal

everything, because I don't see any reason for doing that. Sort of like a class-action settlement, where people explain why they compromised the settlement and they openly discuss, in a joint motion, the pros and cons of the case.

So because the settlement is still contingent on Court approval, we'll keep it *ex parte* for now; but when we wrap it all up, we'll open up the record so that the public can see what we've done here.

All right. Let's talk then about the -- the treatment of the money. I have the request in the Hopinka estate that there be an allowance paid. Let me explain why I think that's perfectly appropriate here -- because the -- one way of looking at this is it's the -- it's the kids' money, and it has to be preserved for their benefit. And so if it were really just from that narrow perspective, I would say, "No. That money is not for their --" generally speaking "-- it's not for their ordinary upkeep. The parents have an obligation to provide that."

But a fairer assessment of what we've done here is that we have the claims of the estate, and the parents have an obligation to support the kids. So the decedents had an obligation to support their children.

So the claim against the -- the moms could make a claim against the estate for child support. And so I think it's perfectly appropriate to use some of the funds for the ordinary support of the children. So I will grant that request for that

1    allowance.  That, I think, makes perfect sense.

2        There's also -- even if it were the children's money, if

3    they really needed it, there's -- there's no sense keeping a kid

4    oppressed and impoverished if that's the -- the situation,

5    because the money is in the UTMA account for their benefit when

6    they're 18.  They don't have to suffer until their 18 to get it.

7    So I have no problem with the request for allowance.

8        But let's talk about how we're actually going to manage the

9    money.  Where is it going to go?  The -- the presentation here

10   from Mr. Lein is that it'll be in an FDI- -- FDIC-insured

11   account.  I'm fine with that.  I think that -- that makes sense.

12       We're talking about relatively small amounts.  So it's not

13   worth it to establish trust and incur the expense of

14   administering a trust, and it's not enough money to think that

15   we're going to get a fancy investment adviser either.

16       So tell me what you have in mind for how we're going to

17   handle the money.

18       MR. LEIN:  Your Honor, my thought was that we would find

19   a -- a bank near one of the mothers.  Now, obviously, the -- the

20   Decorah situation is -- that's an outlier.  But finding a --

21       THE COURT:  Yeah.

22       MR. LEIN:  -- find an FDIC-insured bank near Ms. Carriaga,

23   near Ms. Whitecloud, and then they can sign an -- an agreement

24   that says they understand how to manage the funds, that the funds

25   are for the benefit of the children.

1      THE COURT:  All right.  I think that sounds fine.  If you go

2  to a -- if you go to a bank and you tell them what the situation

3  is, they probably have a small investments area that they can

4  kind of advise you on what to do with it.  Probably putting it in

5  a savings account is probably -- you probably can do a little bit

6  better than that.  You might end up just having it in CDs.  I

7  don't -- I don't know what the investment options are.  But if go

8  to a bank -- if you go to a decent bank, they'll have somebody

9  who can advise small investors.

10     So I'm not going to -- I'm not going to worry about that.

11  It's certainly not worth trying to establish a trust when we have

12  these smaller amounts.  I don't want to have a cumbersome

13  expensive thing that drains money away from the -- from the kids.

14  So I think that -- that is the appropriate way to do it.

15     Let's talk about Mr. Decorah's share.  This is -- this

16  introduces a bit of a complication.

17     So does Mister -- tell me what you know about the younger

18  Decorah's status with respect to his parent or legal -- surviving

19  parent or legal guardian.  Who is -- who is -- who is in charge

20  of him?  Who is his parent?

21     MR. LEIN:  Your Honor, I've had some conversations with

22  Ms. Carriaga about this.  And, unfortunately, the Decorah-child

23  situation is suboptimal.  I understand that the --

24     THE COURT:  Yeah.

25     MR. LEIN:  -- the -- the remaining parent has a

1    substance-abuse problem.  I've made a lot of attempts to try and

2    get ahold of her.  I think Ms. Carriaga, who has -- we'll call it

3    a "tangential relationship" with her -- has reached out but

4    hasn't gotten a response.  I know Attorney Barnes has attempted

5    to reach out to the remaining parent a number of times.  We've --

6    we've only gotten crickets.

7        What to do with that -- you know, I suppose we can put it in

8    an FDIC-insured account.  We could probably hire a private

9    investigator to maybe try and locate the person.  I -- I don't

10   know.  I honestly don't know.

11       THE COURT:  All right.

12       MR. LEIN:  But there's money there, and there's money to

13   support that child at some point.

14       THE COURT:  All right.  All right.  So let me just tell you

15   my -- my concerns.  I'm not that concerned with where the money

16   goes at this -- at this point.  And so, frankly, what I've -- we

17   could take it here at the Court.  That's -- to use Mr. Lein's

18   term, that's "suboptimal."  We're able to do it, but it's not

19   something that we really like to do, because we got to keep track

20   of it.  Our investment options aren't really -- we have an

21   interest-bearing area, but it doesn't pay very much.  So we're

22   talking about really low -- you know, like, treasury-, you know,

23   -established interest rates.  It's not -- it's not really

24   attractive.

25       So I probably would be comfortable just saying that Mr. Lein

1    can keep it in his trust account until we figure out where it --

2    where it goes.  If he doesn't want to do that, I'm -- I'm kind of

3    open to any reasonable solution on that.  That's not my primary

4    concern.

5         What I would like to do is make sure that the younger

6    Mr. Decorah knows about it.  And so I don't know if this is

7    within the purview of what the U.S. marshals could do, but I

8    would do -- at the end of this, I do a court -- you know, an

9    order or a notice to provide to the younger Mr. Decorah so that

10   he would know that there's money for him when he turns 18 so that

11   he could get it.  Maybe the marshals could get to it.  And so

12   they -- they're very good at that kind of thing.  So I will check

13   to see if that's -- if that's an option.

14        But here's the -- here's the concern that I have for our

15   case:  Is that the Decorah estate has participated in this case

16   because we had the probate and the PR can accept this settlement

17   on behalf of the Decorah estate.  And I think the primary claim

18   here really would be from the Decorah estate.  But the younger

19   Mr. Decorah, who would have a -- a potential claim for his own

20   loss of society and companionship, or whatever claim he thought

21   he might have, is not really perfectly extinguished here by our

22   litigation, because he didn't participate, because the -- the

23   surviving parent didn't agree to participate in the -- in the

24   lawsuit.

25        So we have looked out for his interest because we appointed

1    a guardian ad litem to look out for those interests.  So we have

2    done the right thing for the young Mr. Decorah, but he didn't

3    actually participate in the lawsuit.  And so his claim is really

4    not perfectly extinguished.

5         So what I would suggest is that -- and I hope this would be

6    satisfactory to the defendants because we can only do so much

7    without his actual participation -- is that if it were approved

8    by his guardian ad litem, I would make his acceptance of the

9    funds contingent on his releasing any claim that he might have

10   against the defendant.  And so that's how I would wrap this up.

11        From the perspective of the defendants -- if he takes the

12   money, then he would have to extinguish his claim with the -- you

13   know, we give him notice that he has -- you know, his interests

14   have been considered during the course of the -- of the

15   litigation.  Here's the money.  If he wants it, he can sign off

16   on it.  If he wants to refuse it and litigate it on his own, I

17   think he'd have a legal right to do that.

18        So, Mr. Lein, that's -- that's my assessment of where we --

19   where we have gotten to, given what we tried to do with the

20   probate and the guardian ad litem.

21        MR. LEIN:  Understood.  Do you -- would the Court like me to

22   put together with -- in conjunction with the other side, some

23   kind of standard release that -- "sign here if you want the

24   money"?

25        THE COURT:  Yeah, I think that -- we're going to need some

1    documents to kind of get this across the finish line.  So I think

2    that's -- that's one of them.  So that they -- that he can see

3    that that's what he's got to do, so.

4        I mean, it's -- it's -- and it's definitely -- it's not a

5    token settlement.  I mean, it's actually a decent amount of money

6    for -- for him.  So -- so, anyway, that's what I think --

7    that's -- that's what I think we -- we should do.

8        Are you comfortable just holding the money in your trust

9    account?  Is that where you want to keep it, or --?

10       MR. LEIN:  I can, Your Honor.  You know, maybe -- maybe

11   limit it --

12       THE COURT:  I don't know who else --

13       MR. LEIN:  -- to a year --

14       THE COURT:  -- has sort of --

15       MR. LEIN:  -- or something.

16       THE COURT:  I don't know who else has legal authority to

17   hold onto it.  So your trust account is ready and it's got --

18       MR. LEIN:  All right.

19       THE COURT:  -- a perfect arrangement, legally, to hold that

20   money for a while until he shows up to get it, so.

21       MR. LEIN:  Sure.  Maybe limit -- I'm going to try to get rid

22   of it in less than a year.  I don't want it sitting there

23   forever.  But I'm going to do --

24       THE COURT:  All right.

25       MR. LEIN:  -- my best to find the -- find the Decorah child.

1    If I have to --

2         THE COURT:  Yeah.

3         MR. LEIN:  -- you know, hire somebody to go down there or

4    drive down there myself, I will.

5         THE COURT:  All right.  I understand that completely.  I

6    wouldn't want it in my trust account forever either.  But at

7    least for the time being -- and I gather he's kind of in the

8    ballpark of being 18; although, I guess I don't -- I don't really

9    know.  In the presentation I've got so far, all I have is that he

10   was 35.  So he -- the child could be closing in on 18, but maybe

11   he's much younger than that.  I don't know if you have any

12   information along those lines.

13        Maybe Ms. Carriaga knows.

14        MR. LEIN:  Jaclyn?

15        MS. CARRIAGA:  I -- I have no -- I'm sorry.  I'm sorry.  I

16   have no clue.

17        THE COURT:  All right.

18        MS. CARRIAGA:  Are we talking about Tyler's child?

19        THE COURT:  Yes.

20        MS. CARRIAGA:  Does Bianca know?  I think he's pretty young.

21   I think he's, like, maybe under 11?  12?

22        Do you know, Bianca?

23        MS. WHITECLOUD HOPINKA:  No.  I would say he's, like, eight

24   or nine.

25        MS. CARRIAGA:  Yeah, I think he's under ten, definitely.

1        THE COURT:  All right.  So we've got a young -- we've got a

2   while before he's eight- -- he's 18.  And I'm concerned,

3   especially if his mom has a substance-abuse problem, that that

4   money's --

5        MS. WHITECLOUD HOPINKA:  His mom's deceased.

6        MS. CARRIAGA:  His mom is -- his mom is deceased.

7        THE COURT:  Oh.  And so who is his guardian?

8        MS. WHITECLOUD HOPINKA:  I think he has a relative that

9   takes care of him.  I'm not sure, though.

10       MR. LEIN:  Is he living with Isaiah's brother or --?

11       MS. CARRIAGA:  No.

12       MR. LEIN:  No?

13       MS. CARRIAGA:  As far as I know, he's living with the -- his

14  uncle Devon, Devon Funmaker.  But, you know, you might be able to

15  get the information from the -- like, the Ho-Chunk Nation.

16       MS. WHITECLOUD HOPINKA:  Yeah, the social services with the

17  Ho-Chunk Nation.  They should know where his placement is and who

18  has him.

19       THE COURT:  All right.  Good.  And I wonder if the tribal

20  counsel might be able to help us holding some -- maybe this might

21  be one where it might be appropriate to set up a simple trust and

22  just have it held for him until he's 18.  I hate to go through

23  the rigmarole, but I just -- other than holding it in your trust

24  account for -- for ten years, Mr. Lein, I -- I think this might

25  be something we -- we need to take a little bit extra -- extra

1    step, so.

2         MR. LEIN:  Understood.

3         THE COURT:  All right.  So that's a little bit of a loose

4    end, but we've got to get it somewhere where it's safe for him

5    that -- that we can count on it being preserved for his benefit.

6    And his life is a complicated one.  But given that he's probably

7    that young, I think we might need to take some steps to take --

8    to take care of him.

9         MR. LEIN:  Your Honor, not to interrupt, maybe one thing I

10   could do is I could reach out to the corporate counsel for the

11   Ho-Chunk Nation.

12        THE COURT:  Yeah, that's what I'm thinking.

13        MR. LEIN:  And, perhaps, you know, we could set up a trust.

14   We could put it in an FDIC-insured account, and then it would

15   up -- be up to the legal department or Indian Child Welfare

16   Department there to kind of manage the trust until the child

17   turns 18.  Something like that.

18        THE COURT:  Something like that I think would be great.  I

19   just -- again, I don't want to make you responsible for it for

20   ten years, but I'd like it to be somewhere safe.  Safe for him,

21   so.

22        MR. LEIN:  Understood.

23        THE COURT:  All right.  Let me just look at my check list

24   here to make sure that I've covered everything, so.

25        How are we going to -- who's going to manage the -- the

1    withdrawals that Ms. Whitecloud has -- has requested?  Is
2    Ms. Whitecloud just going to manage the account on her own and
3    just --
4         MR. EIDEN:  Your Honor, what I had envisioned was that the
5    order approving the settlement would make -- was something she
6    could present to the financial institution, setting forth the
7    terms that these amounts are deposited, but it's permissible that
8    these sums come out perhaps on an automated basis pursuant to
9    that order so that she doesn't need to run down to the bank every
10   month.
11        THE COURT:  Sure.  Sure.  That'd would be fine.  I can do an
12   order that will -- I'll do an order that will provide that, and
13   we'll leave it to Ms. Whitecloud to manage that.
14        I think in a normal UTMA savings account set up by a parent,
15   I think they would just permit withdrawals from -- by the parent,
16   I think, so.  But I'll have an order that authorizes it.
17        MR. EIDEN:  Okay.  Thank you.
18        THE COURT:  All right?
19        All right.  So I think what we need here is I need a draft
20   order kind of approving the settlement on the terms that I've --
21   that we've discussed here today.
22        So, Mr. Lein, why don't you prepare a proposed order for me,
23   and then we'll submit that, and I -- I'm ready to approve this
24   and then move this to the -- to the probate court.
25        I think I can wrap this up before the probate wraps up

1    because the probate is going to handle -- if I understand -- am I

2    correct about your intention that the full settlement amount will

3    be, then, placed into the estate and run through the probate?

4        MR. LEIN:  Well, Your Honor, I -- maybe I -- maybe I'm

5    misunderstanding what you're saying.

6        My -- my thought was, for the Vidana family, 40K would go

7    into the probate.  The remainder would go to the children today

8    and to the FDIC-insured account with the note being that Sander

9    King is now north of 18.  So he can collect his money now.

10       THE COURT:  Yep.

11       MR. LEIN:  The same concept for the Hopinka and Decorah

12   children.  And then when the probate -- when the respective

13   probates are done, the net would go into the --

14       THE COURT:  Okay.

15       MR. LEIN:  -- setup FDIC-insured funds.  That was my

16   intention.

17       THE COURT:  I don't have any problem with that, because it

18   makes -- it gets the money to the -- to the kids a little bit

19   more quickly than running it through the probate.  Okay.  I'm

20   fine with that.

21       You know, then there'll -- there'll be a residual payment of

22   a certain amount that comes out of the probate to the -- to the

23   kids as well, but they'll get the bulk of it now.  I'm fine with

24   that, but I don't think -- I don't think I need to wait until the

25   probate's done to sign off on everything, because the probate

1    court will do its work and approving your fees in the probate

2    business, which is I -- I think properly considered to be

3    separate from my work here, so.

4        All right.  So I'll ask for a draft order, and you'll send

5    me the -- you'll send me the settlement agreement, and then I

6    think we're in a position to wrap -- wrap up our work.

7        MR. LEIN:  Understood.

8        Your Honor, just one thought:  Perhaps -- I will adjust the

9    settlement statements.  I did it in Excel.

10        THE COURT:  Yep.

11        MR. LEIN:  And I will give you what my interpretation of

12    what your direction is here today; but maybe to appease the

13    Court -- in case there's, like, something different -- perhaps

14    what I could do is I can send to your secretary the Excel file;

15    and then if my understanding was different than yours, you could

16    adjust it appropriately and --

17        THE COURT:  That would be great.  That would be great.

18    Thanks.  And if you look at our -- I think the pretrial

19    conference order has the Court's email for proposed orders.  So

20    you could send it there.

21        All right.  Are there any other questions or concerns for

22    today?

23        MR. LEIN:  None from me, Your Honor.  Thank you so much for

24    your time.

25        THE COURT:  Very good.  Thank you all for your work.

1          THE CLERK:  The Court is adjourned.

2              (Proceedings concluded at 9:50 AM.)

3                          ***

4    I, PHILIP C. HARRELSON, Certified Realtime and Merit Reporter in and

5    for the State of Wisconsin, certify that the foregoing is a true and

6    accurate record, transcribed to the best of my ability, of the

7    proceedings held on the 23rd day of May 2024, before the Honorable

8    James D. Peterson, Chief District Judge of the Western District of

9    Wisconsin, in my presence and reduced to writing in accordance with

10   my stenographic notes made at said time and place.

11

12

13

14                          Dated this 5th day of June, 2024.

15

16

17

18                          /s/Philip C. Harrelson

19                          Philip C. Harrelson, RMR, CRR
20                          Federal Court Reporter

21

22

23

24

25   The foregoing certification of this transcript does not apply to any
     reproduction of the same by any means unless under the direct
     control and/or direction of the certifying reporter.